IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 19, 2020 Session

**STATE OF TENNESSEE v. PATRICK DEAN ARMSTRONG**

**Appeal from the Circuit Court for Marshall County**
**No. 17-CR-101      M. Wyatt Burk, Judge**

_____

**No. M2019-01487-CCA-R3-CD**

_____

The Marshall County Grand Jury indicted Patrick Dean Armstrong, Defendant, for one count of first degree premeditated murder in the death of the victim, James Dockery. Following a trial, the jury convicted Defendant of the lesser-included offense of aggravated assault resulting in death. The trial court denied alternative sentencing, citing the seriousness of the offense and the need for deterrence, and sentenced Defendant as a Range I standard offender to five years and six months' incarceration at seventy-five percent release eligibility. Following a review of the record and applicable case law, we affirm the conviction and the length of the sentence. However, we hold that the trial court erred in denying alternative sentencing. Following de novo review, Defendant's sentence is modified to one year in confinement to be followed by four years and six months' supervised probation, and the case is remanded to the trial court for the entry of an amended judgment consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, Modified in Part, and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellant, Patrick Dean Armstrong.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Andrew Wright, District Attorney General; and William Bottoms, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

*Trial*

State's Proof

Captain Scott Braden of the Lewisburg Police Department testified that, on the night of August 18, 2017, he received a call from dispatch regarding an "assault with injuries" at Ye Ole Steakhouse ("the bar"). When he arrived, two other officers were already at the scene.

Captain Braden testified that, when police arrived at the scene, the victim was on his side. He noted that, in one photograph, there was blood, vomit, beer, and urine on the pavement around the victim. Captain Braden testified that there was blood on the victim's nose, mouth, and under his eye, as well as blood on the victim's shirt and on the ground. He stated that the contents of the victim's pockets included a cell phone, a pack of cigarettes, and two cigarette lighters. Captain Braden said that the license plate of the car belonging to Defendant's girlfriend matched the first three numbers provided by dispatch of a vehicle that had left the scene.

Captain Braden stated that the pool stick used to assault the victim was sent to the Tennessee Bureau of Investigation ("TBI") for fingerprint analysis. He said that the TBI report indicated the pool stick had prints from Defendant's right ring finger and right palm. Captain Braden identified a photograph of Defendant and the victim, "right before [Defendant] hit [the victim] with a pool stick." Captain Braden noted that, despite Defendant's statement to police, nothing was visible in the victim's right hand.

The State played for the jury the video surveillance footage of the inside of the bar as Captain Braden narrated. He identified Defendant playing pool with Richard Darnell, and he noted that the victim placed some coins on the side of the table "to rack a new game." The victim racked the balls and began playing pool, and Defendant approached the victim. Defendant walked to the table and put the balls in the pocket or rolled them to the corner of the table. Defendant and the victim spoke aggressively with each other. The victim walked away from the pool table and sat at a table with his wife, Janice Dockery. Later, the victim turned around and faced Defendant, and the victim and Ms. Dockery stood up. Defendant walked out the front door of the bar carrying a pool stick. Then the victim and Ms. Dockery left the bar via the front entrance. Defendant returned inside the bar, walked to the pool table, and placed the pool stick on the table.

The State also played for the jury the video surveillance of the outside of the bar as Captain Braden narrated. The video reflected that Defendant came outside the bar holding a pool stick "with the thick end of the stick up." Chris Rogers was standing next to Defendant when the victim came outside. Captain Braden described the scene: "[The victim] is walking up approaching [Defendant]. When he gets within a couple feet of [Defendant], [Defendant] takes the pool stick and swings at the head of [the victim] striking him across the arm and face area, [and] [the victim] drops the bottle, as you can see." Captain Braden noted that the victim was holding a beer bottle down by his side and that the victim did not raise his hand until Defendant swung at him. Captain Braden continued: "After the first swing, [the victim] is going backwards on his feet towards the truck. [Defendant] immediately follows up with a second swing to the side of the face and head area, knocking [the victim] unconscious to the ground." Several patrons came out of the bar and checked the victim to see if he was alive. Captain Braden noted that the victim was "struggling to breathe. Essentially, about to die." Defendant and Ms. Dockery argued. Then, Defendant and three other individuals left the scene in a white Nissan Sentra.

Captain Braden stated that, after officers arrived at the bar, they questioned the witnesses at the scene and gathered evidence. EMS arrived and treated the victim. During the course of "processing the scene," Captain Braden learned that the victim died.

Captain Braden met with Defendant when he later turned himself in at the sheriff's department. Defendant stated that he had completed twelfth grade and could read and write. He said that he was not under a doctor's care and did not take prescription medications. Defendant said that he had two and a half beers, had ingested no controlled substances, and was not intoxicated. He stated that he had Attention Deficit Hyperactivity Disorder but no other mental or emotional problems. Defendant waived his *Miranda* rights and provided a written statement, which Captain Braden read:

I got to the bar Ole Steakhouse about 10:45 to 10:30 p.m. I went there [in] my girlfriend, Nichole Bise's (phonetic) car. It's a 2013 - 2014 white Nissan Sentra. When I first went in, I played a game of pool. After I played the game, I sat down and drank a beer and talked to Chris, Gary, Susan, Cindy, and Stephanie.

I finished the first beer and then got a second beer and went back to play another game of pool. I was drinking my second beer while playing pool with a guy that had a crooked eye. I won that game. Then, I played a younger guy, and I beat him, too. Then I played the guy that I hit with the pool stick and I beat him in a game. The guy went and got change and then came back to the table. I beat him a second time.

At the start of the third game, I went to the bathroom. When I got back, he had already racked and busted the balls out of turn. I told him, he broke out of turn, but it would [be] all right. He got mad and [threw] his stick on the table and hit the balls. I tried to put the balls back and even put them closer to the pockets for him. He got mad and said, that's not how you play pool.

He threw his pool stick on the table and walked off. After he done that, he walked off and started cursing me and saying that's a good way to get your ass whipped. He was talking to everyone else in there. Stephanie told me to go to the other side and get away from him. I went to the other side and he was on the opposite side of me.

He started pointing at me, calling me a son of a bitch. I told him that was the last son of a bitch that I was going to be. I decided to leave and told them I was leaving.

I was headed to the door. I still had the pool stick with me. It was actually near me. The pool stick was leaned up in the corner. I started out the door and he was still mouthing at me. Stephanie thought she had it under control and went back to the bar.

I went out the door with the pool stick for protection. He came out the other door with a beer bottle in his hand. The beer bottle was in his left hand and he had something shiny in his right hand.

He said, ["]If you want some of this, you can get some of this.["] He went into swinging it at me, and I took the little end of the stick and blocked it. Then I hit him with the big end of the stick somewhere between his shoulder and jaw. He dropped. And I went back inside and laid the pool stick back on the table.

After it happened, then everybody was trying to stop it. After I put the pool stick on the table, I went to the car and left with Chris. I carried Chris home. I called my mom and told her what happened. I told her I got in a fight and hit a guy with a pool stick. I told her, if the police show up at your house, call me, and I will come and talk to them. I sent the message through text message to my mom. When I sent my mom the text, I was already in my girlfriend's house. She lives on Anna Station Road.

I took a shower. And then my mom called and said the police were here looking for me. I got ready. Came to the sheriff's department to see what it was about. I left the bar because someone at the bar said, it would be best if you left. So I left.

I am correcting the part where he came out with a beer bottle in his hand. When he approached me, he had the beer bottle in his left hand, but started taking something -- taking something shiny out of his right pocket. He then put the beer bottle in his right hand to swing it and put the skinny object in his left hand.

This statement was written for me by Captain Scott Braden, and is true and correct, and I approve it as my own.

Captain Braden then opined on the discrepancies between Defendant's statement and the video footage, including where Defendant walked at certain points in the video, whether he had a pool stick in his hand when he walked to the door of the bar, whether the victim had something in his left hand when he left the bar, whether the victim swung the bottle at Defendant, where Defendant hit the victim, and how many people Defendant left with. Captain Braden repeated "that's a lie" several times when identifying these discrepancies between Defendant's statement and the video surveillance footage. He testified that no knife was found at the scene.

On cross-examination, Captain Braden testified that the jury was shown the entire video surveillance that the officers were able to obtain from August 18, 2017. He stated that he was unaware of any further video until defense counsel presented an earlier-in-time video at the preliminary hearing. He stated that Detective Garrett[1] spoke to the bar owner to procure the footage and "got everything he could get. Now, if [the bar owner] chose not to give it to Detective Garrett, or not disclose it, there's nothing I can do about that. I can't read that man's mind." After reviewing Defendant's additional video surveillance footage before the jury, Captain Braden stated, "Ms. Dockery is up walking around, but the circumstances of what happened are the same. . . . I mean, yeah, she's obviously -- she's been drinking."

Captain Braden stated that one witness, Dennis Whitsett, lied to officers because he gave two conflicting statements. However, Captain Braden agreed that, in both statements, Mr. Whitsett said that he saw the victim with a knife.

---

[1] Detective Garrett's first name does not appear in the record.

Captain Braden noted that Brandon Belote turned the victim from his back to his side. When Officer Amanda Binkley arrived, she rolled the victim to his back again, and the victim struggled to breathe. Captain Braden explained why he did not intervene:

> I wouldn't have moved him at that point. I'm not trained. I'm not an EMT or paramedic. He was breathing. He had a heart rate. When [Officer] Binkley rolls him over, she is going to be assessing him to see if he had any other injuries, stab wounds. If he had been shot, or anything else, not knowing. And she rolled him over because if he had to have CPR, they would have to have him on his back. Once he was rolled over -- I'm not a trained EMT to do anything further with him.

Captain Braden testified that the victim was on his back for "four or five minutes" before the paramedics arrived. Captain Braden did not dispute that the victim had "vomitous material" in his airway during his autopsy.

When asked whether Defendant premeditated the killing, Captain Braden stated,

> Oh he knew [the victim] was going to come out. . . . Why do you think he's waiting on him outside the door? . . . Either way, [Defendant] went out the door to wait on [the victim]. And if you've seen him, I mean, he hits him in the head. . . . If you target this area, I'm sorry, but, to me, you have to know there's a good chance you're going to kill somebody. If not, there's the legs, arms, anywhere else. As a police officer, if I struck someone in the head with [a baton], I would have to be justified in deadly force.

Captain Braden agreed that the autopsy report did not indicate a skull fracture or internal brain bleeding. Captain Braden stated, "The bottom line is, sir, if [Defendant] hadn't struck [the victim] with that pool stick, [the victim] would have [gone] home alive that night."

Captain Braden stated that, when he interviewed a witness, Melissa Richards, he did not believe that she was being honest. He said that Ms. Richards "referenced the knife or overhearing conversation about a knife" and that he did not recall her having a motive to lie, yet he did not believe her. He acknowledged that Ms. Richards was sitting by the victim and Ms. Dockery in the video and would have heard their conversation. Captain Braden stated that some witnesses made statements that the victim threatened Defendant but that there was "nothing in this investigation from . . . [his] standpoint that led [him] to believe [the victim] was ever going to cut [Defendant]." Captain Braden

stated that he "had no reason" to look in Ms. Dockery's purse for a knife because "[s]he was asked . . . several times since then and [said] there was no knife."

Tim Waters testified that he was running karaoke at the bar on August 18, 2017. He said that Defendant and the victim were playing pool and that, at some point, "there was some kind of conflict." Mr. Waters did not observe any threatening or violent behavior between Defendant and the victim; however, "at some point, there were a few other guys in between them, you know, to keep them from getting into a physical confrontation." Mr. Waters did not see the victim with a knife. Mr. Waters said that the victim walked out one door, Defendant walked out the other door, and Mr. Waters started to follow them outside. Mr. Waters heard a "crack sound" and then stepped outside seconds later. When Mr. Waters got outside, he saw the victim on his back, unconscious on the ground.

Mr. Waters stated that, after the initial altercation inside when Defendant and the victim had separated and seemed calm, he observed Ms. Dockery take pool balls off the pool table and put them in the table pockets.

On cross-examination, Mr. Waters stated that, when he heard the "crack sound," the karaoke music was not playing. He said that he did not see Ms. Dockery push Defendant. Mr. Waters agreed that Mr. Whitsett was "probably" one of the men who stepped between Defendant and the victim inside the bar to separate them during their altercation.

Troy Castile testified that he was at the bar on August 18, 2017, and that he had one beer. Mr. Castile said that he did not personally know Defendant or the victim. He stated that he observed a "heated conflict" over a pool game and "a dollar." He said that the conflict seemed to calm down, but then it "heated up again" and the victim and Ms. Dockery left. Mr. Castile saw Defendant leaving with a pool stick in his hand, and Mr. Castile followed Defendant outside. Mr. Castile testified that, when he walked outside, Defendant was holding the pool stick by the "skinny end." He said that Defendant hit the victim once and that he tried to get the victim to move. Mr. Castile stated that Defendant hit the victim again and the pool stick broke, "not completely in [two], but it cracked the stick." Mr. Castile testified that the victim spun around and that he "grabbed [the victim] so to kind of cushion his fall a little bit." He said that bystanders called 911, and Defendant went back inside the bar. Defendant came back outside, got into a four-door Nissan, and left.

On cross-examination, after reviewing the video surveillance footage, Mr. Castile agreed that he did not follow the victim and Ms. Dockery out of the bar, nor did he attempt to catch the victim. Mr. Castile clarified that, as he was coming out the door to

the bar, he observed Defendant hit the victim. Mr. Castile agreed that his memory was better on August 18, 2017, when he gave his statement to police than it was at the time of trial. He agreed that his original statement to police was, "I was on my way out the door. By the time I got out, dude done hit the man twice."

Dennis Whitsett testified that he was present at the bar on August 18, 2017. He said that he only knew Defendant's first name prior to that night and that he did not know the victim. Mr. Whitsett stated that Defendant and the victim "got in a verbal altercation," so Mr. Whitsett "stepped in between them and instructed them if they were going to handle their business, it would be taken outside." He said that the victim returned to his table but that, a few minutes later, both the victim and Defendant went outside. Mr. Whitsett did not know how the altercation restarted.

Mr. Whitsett recalled that he saw the victim pull a knife and heard the victim say, "I'm going to stick you" or "I'm going to get you." Mr. Whitsett threatened to "call the cops" if the victim did not put the knife away. Mr. Whitsett agreed that he had been drinking heavily on August 18, 2017. He did not remember whether he used the particular phrase "I'm going to stick you" when he gave either of his two statements to police. He recalled his wife writing a statement for him on August 18, which he signed. Mr. Whitsett also remembered signing one statement written by police, approximately one month later. Mr. Whitsett testified that he did not remember what happened to the knife. He said that Defendant told him, "If [the victim] comes at me with that knife, I'm going to F him up."

On cross-examination, Mr. Whitsett stated that he saw Ms. Dockery "push" Defendant several times during the night and said, "She got up in [Defendant's] face several times[.]"

Brandon Belote testified that he was present at the bar on August 18, 2017. Mr. Belote had "two or three" beers. Mr. Belote said that he knew Defendant but only knew the victim "in passing." He said he knew that there was an incident between Defendant and the victim but that he did not see what was happening when it began. When the altercation grew louder towards the door, it attracted Mr. Belote's attention. He said, "All I remember is, I saw [Defendant] walk out of the door with a pool cue and was outside for several minutes. I don't know how long it was. And then [Defendant] came back in . . . and said, 'I hit him.' And that's when I went out the door." Mr. Belote heard Defendant say that the victim was on the ground and that someone needed to "get him up."

Mr. Belote testified that he went outside and saw the victim on the ground, starting "to asphyxiate and vomit." Mr. Belote stated that he raised the victim's arm and moved

the victim's head to the side to clear his airway. He said that another witness had called EMS, so he asked to speak to them. Mr. Belote told EMS that the victim "had been struck in the head [and was] bleeding from his ear" and that "he was beginning to asphyxiate and they needed to get there." Mr. Belote noticed that the victim urinated on himself. Mr. Belote said that, when police arrived, he asked for something to wipe the victim's mouth so that Mr. Belote could administer CPR but that the police officer told him to wait for EMS. Mr. Belote never saw a knife near the victim. Later that night, after the victim died, Mr. Belote sent Defendant a private message through social media telling him that the victim was dead and that Defendant should turn himself in.

On cross-examination, Mr. Belote testified that he was a former soldier and a "prepper" who "went over stuff like" CPR with friends who were EMS. He said that, based on his training, he knew to raise the victim's arm to check for an obstruction. Mr. Belote was present when Officer Binkley returned the victim to the supine position. Then he went back inside the bar.

Sheila Price testified that she and her boyfriend were present at the bar on August 18, 2017. She stated that she knew the victim and Defendant and that they argued over a pool game. She recalled that the victim "grabbed a beer bottle and then his wife grabbed it from him and sat it back down. And then [the victim] grabbed another beer. Then he walked out the door closer to the pool table, because that's where they [were] sitting." Ms. Price stated that, after the victim walked out, Defendant also walked out carrying a pool stick. She explained that she got up from her table, walked over to the window, and looked out. Ms. Price observed the victim lying on the pavement, "his eyes roll[ed] back in his head," and she "thought he was having a seizure." Ms. Price testified that she never saw the victim with a knife.

On cross-examination, Ms. Price stated that she never saw Ms. Dockery push Defendant. She stated that Ms. Dockery stayed in her seat the whole time, "even with her husband out there bleeding on that parking lot, she stayed in her chair." Ms. Price said that Ms. Dockery was "very drunk."

Terry Wayne Crosslin testified that he was present at the bar on August 18, 2017, and that he did not know Defendant or the victim before that night. Mr. Crosslin stated that Defendant and the victim had an altercation over a pool game. He said that the victim was getting upset and that the victim "got up from the table and went out the door." Mr. Crosslin stated that Defendant then walked out of the bar with a pool cue in his hand. He said the victim "had a bottle, a beer bottle, he went outside with. He had it down to his side. As I recall, [Defendant] came out without notice, swung at [the victim] once. And then once [the victim] went down to the ground, [Defendant] swung a second time." Mr. Crosslin stated that he never saw the victim "provoke" Defendant.

On cross-examination, Mr. Crosslin stated that he did not recall Ms. Dockery agitate or push Defendant. He testified that he witnessed the altercation outside the bar by viewing it through a window.

On redirect examination, Mr. Crosslin stated:

> By the time I come out the door there, I just recall you know -- by the way it looked to me, I didn't actually see [the victim] you know coming down to the ground. But it looked like he was flung while he was on the ground, because my peripherial (sic) at the time was kind of altered by someone else in front of me.

Janice Dockery testified that she was the victim's wife and was present at the bar on August 18, 2017. She said that she and her husband were celebrating her birthday that evening and that she consumed "quite a bit of alcohol" and had smoked some marijuana. Ms. Dockery stated that she put a dollar on the pool table so the victim could play pool. She stated that the victim and Defendant got into a fight over the pool game and "exchanged words." Ms. Dockery said, "Next thing I know, we were going outside. And then, that's it. That's all I remember."

Ms. Dockery said that her memory was "not good" even when she was not drinking. She stated that, before the night her husband was killed, she did not know Defendant. Ms. Dockery testified that she was "positive" that the victim did not have a knife on the night he was killed. Ms. Dockery stated that she remembered trying to give Defendant "the dollar back and told him [there was] no sense in arguing over a dollar."

Ms. Dockery testified that the victim had hepatitis, was really weak, and had pins in his leg where it had been "crushed." She said that the victim "took a whole bunch of medication" and that "he was just sickly." Ms. Dockery agreed that she had filed suit against Defendant, the bar, EMS, and the Lewisburg Police Department.

On cross-examination, Ms. Dockery stated that she did not know that the victim had an enlarged heart and pancreatitis or that he was taking Xanax and Valium at the time of his death. She said that she did not realize that she was suing Lewisburg Police Department and EMS for $10 million because her attorney did that. After reviewing the video footage, Ms. Dockery stated that she did not remember the events of the evening, but based upon the video, she agreed that she might have been agitating Defendant.

When reviewing the video surveillance footage from outside the bar, Ms. Dockery agreed that the victim passed his vehicle and therefore was not preparing to leave. Ms.

Dockery stated that the victim was a "master carpenter" but that he did not always carry a knife. She denied that the victim had a temper.

Richard Darnell testified that he was present at the bar on August 18, 2017, and that he did not know Defendant prior to that evening. Mr. Darnell stated that he knew the victim for many years. He said that Defendant and the victim got into a fight over a pool game and "four quarters." Mr. Darnell recalled that Ms. Dockery "got up and pushed all of the balls in the corner" and said, "'To heck with this. Come and sit down.'" He explained that, about an hour later, another altercation began because the victim "sho[t] the wrong suit of balls." Mr. Darnell stated that Ms. Dockery took the victim by the arm and that Mr. Darnell thought they were going home. He recalled that he looked out the window and "[saw] hair falling." Mr. Darnell said:

> Well, I walked outside. And I said, ["]Who done this?["] And they said, ["]The guy you're shooting pool with.["] So I walk[ed] back in. And by the time I got in the door, I wasn't two steps behind [Defendant], I walked right behind him to the pool table. And [Defendant] [sat] the pool stick down. And I said, ["]Why did you have to carry a stick out there? Can't you fight with your fist and your feet?["] He said, ["]Well, [the victim] had a bottle.["]
>
> And then [Defendant] walk[ed] out the door, and I walk[ed] out behind him. And I said, ["]Look what you done.["] And he goes and gets in the car. And [Defendant] . . . start[ed] the car and [took] off. [Defendant] holler[ed], ["]Ain't going to do you no good to get the tag number. The car don't belong to me.["] He knew what I was doing. I was over there getting the tag number.

Mr. Darnell stated that he did not see Defendant hit the victim but that he did see Defendant carrying a broken pool stick.

On cross-examination, Mr. Darnell said that a police officer wrote down his statement on August 18, 2017, and that he signed it without reading it. He denied telling the officer the portion of his statement that read: "I was inside racking balls. Heard a commotion outside. Went to look out window and saw guy hit another with a pool stick." Mr. Darnell denied seeing or hearing about a knife and stated that, during the verbal altercation over the pool game, Defendant came over to Mr. Darnell and "said something" to him. Mr. Darnell told Defendant to "just let it be, man. It's just a dollar pool game."

- 11 -

Officer Amanda Binkley of the Lewisburg Police Department testified that she was called to the bar on August 18, 2017. When she arrived, Sergeant Wendy Sawyers told her to turn the victim over and assess his injuries. Officer Binkley rolled the victim over and noted injuries on the victim's temple and that the victim was not breathing normally. She did not perform CPR because the victim was still breathing. Officer Binkley recalled that, because EMS was en route, she "snapped a couple of pictures real quick." She checked the victim's pockets for a wallet but found them empty. Officer Binkley denied seeing a knife at the scene.

On cross-examination, Officer Binkley stated that she did not recall any vomit on or around the victim. She stated that she did not return the victim to his side because "there wasn't any kind of regurgitation or anything happening. . . . [The victim] was just [lying] there like he was asleep like on a ventilator. He was breathing real deep and out real fast. So there was no indication that I needed to roll him back over."

Marshall County Paramedic John Cooper testified that he was called to the bar on August 18, 2017. When he arrived, he noticed the victim lying on the ground with "some blood around him[.]" Mr. Cooper recalled that he saw injuries on either side of the victim's head and vomit in the victim's nose and mouth. He stated that the victim was unresponsive with "labored breathing." He said that several people had to work together to get the victim on the stretcher. Mr. Cooper explained that they placed the victim on the gurney "semi-fowler," meaning his head was slightly elevated. He said that the victim stopped breathing and his heart rate decreased. Mr. Cooper stated that he was "able to ventilate" the victim. He said that the paramedics were able to suction the vomit from the victim's mouth and place a tube down the victim's throat to control his breathing.

Mr. Cooper recalled that they attempted to get the victim to the airport to be flown to Vanderbilt Medical Center. Once Mr. Cooper turned the victim over to "Air Evac," the victim went into cardiac arrest, so Air Evac was not able to fly the victim to Vanderbilt for safety reasons. Mr. Cooper stated that, once the victim went into cardiac arrest, they transported him by ambulance to Marshall Medical Center Emergency Room. He testified that the victim was pronounced dead at the emergency room.

On cross-examination, Mr. Cooper denied seeing the victim with a "lacerated tongue." He stated that he did not know the victim's alcohol content, whether the victim was taking prescription medication, or if the victim had heart and lung problems. After viewing the video surveillance footage, Mr. Cooper recalled that, when he placed the victim on the gurney, even though he expected the victim to have a head injury, he did not use a "spinal board," which is a "spinal motion restriction device." Mr. Cooper agreed that, when he lifted the victim, he "lo[st] control of him" and that the victim's

head hit the ground. Mr. Cooper stated that, although he suctioned "100 milliliters" of vomit from the victim's mouth, it was not "all at once" because the victim continued to vomit. Mr. Cooper agreed that, when the victim was in the ambulance, he had "agonal breathing," which Mr. Cooper described as "gasping." He stated that intubation of the victim was unsuccessful. Mr. Cooper recalled that he "ventilate[d]" the victim with a "bag valve mask" prior to suctioning any vomit from his airways and that the victim's nail beds were turning blue. He agreed that a bag valve mask could force vomit into the victim's lungs. Mr. Cooper noted that the victim's oxygen saturation was seventy-nine and stated that he prefers a patient's oxygen saturation to remain near ninety. Mr. Cooper agreed that, when he turned the victim over to Air Evac, they found "copious amounts of vomitous material" in the victim's airway. Mr. Cooper explained that, when he first arrived at the scene, the victim was in "normal sinus rhythm" indicating no cardiac problems and that, once the victim began agonal breathing in the ambulance, his heart rate was irregular.

On redirect examination, Mr. Cooper said that, after he used the bag valve mask, the victim began to breathe normally again. He stated that, as he administered assistance, the victim's status would change, and he changed his approach accordingly. Mr. Cooper explained that, when he attempted to get the victim on the gurney and the victim slipped, his head dropped only "an inch or two" to the pavement.

Gerald William Thomas, Jr., testified that he was a paramedic with Air Evac 9 in Lewisburg and that he was on duty on August 18, 2017. He received a call from dispatch that EMS was bringing the victim to the Air Evac base. Mr. Thomas stated that he and his partner, Seth Lockard, planned to take the victim to Vanderbilt Medical Center because it was a level one trauma center. He said that, when the victim arrived, he noted that the victim was lying flat on the stretcher, was unresponsive, had agonal breathing, had fixed and dilated pupils indicating brain trauma, and had a contusion on the side of his face. Mr. Thomas recalled that he and Mr. Lockard intubated the victim and that, after about ten ventilations, "vomit filled the . . . tube and oral suction was performed." He said that he was unable to clear the victim's airway or ventilate the victim further, so he dislodged the tube. He said that when they re-attempted intubation, the victim "had more vomit come up" so Mr. Lockard was "unable to pass the tube." Mr. Thomas stated that the victim's heart stopped and that he performed CPR. He said that they decided to take the victim to the nearest emergency room since it was against protocol to fly a victim in cardiac arrest. Mr. Thomas recalled that the victim never regained consciousness and was pronounced dead at the emergency room.

On cross-examination, Mr. Thomas agreed that, when he intubated the victim, he gave the victim a sedative and a paralytic. Mr. Thomas explained that the paralytic "basically paralyzes your whole system. It knocks out your respiratory drive where you

won't be able to take a breath." Mr. Thomas agreed that, when a bag valve mask is used on a patient with copious amounts of vomit in his airway, the vomit could go into the patient's lungs. He said that it was protocol to suction the vomit from the airway prior to using the bag valve mask. Mr. Thomas said that, because the intubation tube was filled with vomit, that indicated to him "there was vomit in the lungs." He recalled listening to the victim's lungs and hearing "something in there that shouldn't be."

Metro-Nashville Chief Medical Examiner Dr. Feng Li testified as an expert witness in forensic medicine and pathology. Dr. Li said that Marshall County Medical Examiner Dr. Kenneth Phelps, Jr., requested that Dr. Li's office perform an autopsy on the victim. Dr. Li stated that Dr. Chester Gwin performed the victim's autopsy and that he reviewed Dr. Gwin's findings. Dr. Li described the victim having suffered "blunt force injuries" due to the victim's contusions and lacerations. He said, "So, the blunt force injury, itself, in this case, probably not sufficient to say -- to cause the person to die." He explained, "[W]ithout there being an assault[], or without any trauma to [the victim], he probably could have survived. We don't know." Dr. Li then agreed that, but for the head trauma, the victim would have survived.

Dr. Li testified that the victim suffered no skull fracture and no brain injury. He stated that the victim had in his system ethyl alcohol, Bupropion, alprazolam, diazepam, marijuana, Metoprolol, and Amitriptyline. Dr. Li explained that these medications are mostly used for mental disorders such as depression and anxiety. He stated that Hepatitis C is a liver disease and that it affects the way a person's body breaks down alcohol. Dr. Li concluded, "The cause of [the victim's] death [wa]s blunt force head trauma[,] and atherosclerotic and hypertensive cardiovascular disease contributed to his death."

On cross-examination, Dr. Li agreed that the blunt force trauma was "not sufficient" by itself to cause the victim's death. He stated that he did not check Dr. Gwin's autopsy of the victim for accuracy. Dr. Li agreed that, prior to August 18, 2017, the victim had heart disease, a fatty liver, an enlarged heart, and was obese. Dr. Li agreed that heart disease can cause a heart attack and that hypoxia can kill a person. He stated that, under normal circumstances, 100 milliliters of vomit in the airway would not cause death but that, if the person was "drunk or diseased or unconscious," it was possible. Dr. Li stated that he "probably [did] not" have any information regarding the victim's loss of airway prior to the autopsy. He agreed that a bag valve mask could push vomit in a person's airway into the lungs. Dr. Li stated,

> And because of the altercation of assault he was down, los[t] consciousness, [had] agonal breathing, and vomiting, maybe aspirated, as a result of this fight or altercation or whatever.

- 14 -

. . . .

Basically, this is the information we got. We had, you know, the altercation. The [victim] is found unresponsive on the ground. Eventually, chest (inaudible) and died. So this is the information. Anything after that, is a result of this incident. . . . [I]f this person is doing normal things, he will not be found on the ground. Difficulty breathing, agonal breathing, unconscious, and vomiting.

. . . .

I will tell you this, whatever the intervening problem in this case will not change the manner of death. Because as I said . . . but for this assault, the [victim] would probably not be on this situation he had. And therefore, there's nothing that would be interven[ing].

Dr. Li agreed that no one in his office requested the victim's medical records prior to the autopsy or trial. Dr. Li explained, however, that the information his office received at the time of the autopsy was sufficient to make a cause of death determination.

On redirect examination, Dr. Li stated that the autopsy report indicated the victim had no airway obstruction. Dr. Li stated that, even with the information presented by defense counsel, his medical opinion of the case had not changed.

Defense Proof

Edward Bowles testified that he was the owner of the bar and was present on August 18, 2017. He stated that, in September of 2017, he gave the defense copies of the video surveillance from the night of August 18, 2017, and placed the video footage on a thumb drive. Mr. Bowles said that, on the night of the incident, police asked him for his surveillance footage, and an officer used a cell phone camera to record the video as Mr. Bowles played it back from the cloud on his cell phone. Mr. Bowles did not know why the footage the police received was twenty minutes shorter than the footage given to the defense.

On cross-examination, Mr. Bowles testified that Detective Garrett attempted to secure more video footage from him but that Mr. Bowles was out of state and was unable to comply. Mr. Bowles testified that, prior to August 18, 2017, he had seen Defendant three times. He said that his wife did not know Defendant well but that his stepdaughter was friends with Defendant. Mr. Bowles denied that his stepdaughter communicated any message to him from Defendant.

- 15 -

Heather Daws testified that she was present at the bar on August 18, 2017. She said that the victim and his wife got upset over "four quarters." The victim told Defendant and Ms. Daws that they "stole their game." Ms. Daws explained that Defendant apologized to the victim, tried to give the victim his money back, and bought the victim and Ms. Dockery beers. She stated that things were "good for a while" and that Ms. Dockery came over and spoke to Ms. Daws in a friendly manner. Ms. Daws recalled Ms. Dockery then "fussing" at Defendant and making "snide comments" about quarters. Then, the victim told Defendant that he was going to "hit [Defendant] up the side of the head with a beer bottle." Ms. Daws said that the victim then walked out of the bar. On cross-examination, Ms. Daws agreed that she left the bar with Defendant before police arrived.

Melissa Richards testified that she was present at the bar on August 18, 2017, and that she did not know Defendant. Ms. Richards stated that she was present for the verbal altercation but left before the victim was hit. She recalled Ms. Dockery agitating Defendant and the victim saying, "I will not fight him. I will cut him."

On cross-examination, Ms. Richards confirmed that she knew Mr. Whitsett but denied hearing anything about a knife from him. She said that she never saw a knife. On redirect examination, Ms. Richards testified that she went to the police station to attempt to give her statement but that she was told they "had enough witnesses" and "didn't need [her] statement."

Susie Victory testified that she was the cook at the bar and was present on August 18, 2017. She said that she knew Defendant prior to that evening. She could not remember whether she gave a statement to police. Ms. Victory stated that she heard Defendant and the victim arguing at the bar. Ms. Victory recalled that, when she was standing in the kitchen doorway, she heard the victim say "something about going and getting a knife." She stated that Ms. Dockery kept "pushing" Defendant and "agging it on."

On cross-examination, Ms. Victory explained that, on the night of the incident, she did not tell the police what she heard about the fight and the knife because she "really didn't want to talk at the time" and she "really didn't want to have to go to court." She said that, during the altercation outside, Ms. Dockery "hid out in the bathroom."

Following deliberations, the jury found Defendant guilty of the lesser-included offense of aggravated assault resulting in the death of the victim.

At the sentencing hearing, the trial court noted that Defendant had no prior felony convictions. The court read into the record the victim impact statement from the victim's sister-in-law.

Terrell Hill testified that he owned Halls Mill Diner and Halls Mill Trucking. Mr. Hill said that Defendant "drove a truck" and operated heavy equipment as part of his employment at Halls Mill Trucking. He stated that Defendant was never late and that he worked as late as was needed. Mr. Hill agreed that Defendant could go back to work if he were granted alternative sentencing. He explained that he never saw Defendant angry or violent. On cross-examination, Mr. Hill stated that he would agree to rehire Defendant after a period of incarceration.

Lori Rich testified that she owned Rich Plumbing and that Defendant worked for her on weekends when he was not at his job with Mr. Hill. She stated that Defendant was loyal and always arrived to work early. Ms. Rich said that the incident "weighed very heav[ily] on [Defendant's] mind" and that he expressed that he did not mean to kill the victim.

Patricia Ann Armstrong testified that she was Defendant's grandmother and had adopted Defendant. She said that he did fine in school and never acted violently. Ms. Armstrong stated that Defendant dropped out of high school when he turned eighteen because he needed to work to support his child. She explained that Defendant expressed remorse over the victim's death.

On cross-examination, Ms. Armstrong testified that she believed the State failed to prove causation at trial and that, if the victim had received proper medical care, he would not have died. She stated that Defendant agreed with her assessment and was "relieved" when it was "proven" that the hit to the head did not kill the victim.

Sharon Dockery, the victim's sister-in-law, testified that she knew the victim only from family functions and funerals. She said that she knew the victim was not in good health and that he abused drugs and alcohol. She stated that she was upset that Defendant's wife "provoke[d] some of the actions that were taken that night."

Defendant then offered his allocution:

I take full responsibilities of my actions. I know, I know, that night, I was minding my own business, like they said, and I was kind of provoked by her. You know, I didn't really have time to get out like I wanted to, like

my intentions were to leave that night. But I have to sit here and go through what I'm going through right now. And I'm not saying that this don't bother me, because it's been weighing on me. And I've seriously learned a valuable lesson. And I want to tell the family I'm sorry.

I never wanted to do any of this, I never wanted to fight. As a matter of fact, I even tried to offer the lady her money back, to try to buy them a beer, to try to give her, her money back and not have to deal with this, and I thought everything was cool. And she come back over there and throwed (sic) my money back at me, and you can see it in the video, and kind of provoked me a little bit, you know. Which I didn't react on that, until he come at me, as you seen. But I'd like to tell the family I'm sorry for everything, Your Honor.

The trial court considered the purposes and principles of sentencing, the evidence at trial, and the presentence report. The court considered enhancement factors. Regarding enhancement factor (1), Defendant's criminal history, the trial court noted two violations of driving on a suspended license but gave this factor very little weight. The trial court applied enhancement factor (9), that Defendant possessed or employed a deadly weapon during the commission of the offense. The court stated

Although a pool stick is not inherently a deadly weapon if used in its proper form, the manner in which [D]efendant used the pool stick converted said object in my opinion to a deadly weapon. This pool stick was used and employed much like a baseball bat would be in order to strike the [victim], not once, but twice, by holding the skinny end in his hands and using the fat end to strike the victim, I believe that he converted the use of an object that wouldn't ordinarily be a deadly weapon into a deadly weapon for purposes of committing the crime. So, I do find number (9) applies [and] I give factor number (9) tremendous weight.

The court applied mitigating factor (2), that Defendant acted under strong provocation, and mitigating factor (3), that substantial grounds exist tending to excuse or justify Defendant's criminal conduct, though failing to establish a defense, but gave those factors "very little weight if any at all." The trial court applied factor (10), that Defendant assisted authorities in locating a person involved in the crime, because Defendant turned himself in. The court stated, "I don't give it any weight at this point, but I will acknowledge that it's there."

The court sentenced Defendant as a Range I standard offender to five years and six months to serve at seventy-five percent. The court then ordered that Defendant serve his sentence in the Tennessee Department of Correction, stating:

Under [Tennessee Code Annotated section] 40-35-501(k)(7), the conviction of aggravated assault, resulting death, I believe is a to-serve sentence. As stated in 40-35-501(k)(7), there shall be no release eligibility for a person committing aggravate[d] assault, as defined in [Tennessee Code Annotated section] 39-13-102, that results in the death of another, on or after July 1, 2013, until the person has served 75 percent of the sentence imposed by the [c]ourt, less sentence credits earned and retained. That's what the statute says, and it doesn't allow sentence reductions or credits to drop below, to reduce it to less than a 60 percent. The [c]ourt, I believe by statute, determines, much like aggravated robbery, that this is a to-serve sentence.

The trial court noted that, in the event it was incorrect, and the offense of conviction was eligible for alternative sentencing, it still would still impose a to-serve sentence. The trial court stated:

If it's determined that it's not a to-serve sentence, the [c]ourt is going to walk through the considerations of alternative sentencing and has so done. I have considered those as laid out in [Tennessee Code Annotated section] 40-35-103, the presentence report; the defendant's physical and mental condition and social history; the facts and circumstances surrounding the offense; and the nature and the circumstances of the criminal conduct involved, but I'm particularly focused on whether or not a sentence of full probation would unduly depreciate the seriousness of the offense. I do believe it would. I absolutely believe that probation in this scenario would unduly depreciate the offense.

Regarding deterrence, the court stated:

There's no doubt in my mind that in this community, there's certainly a need to protect patrons from conduct that was displayed. This was inexcusable. I, I don't believe, and I don't think the facts showed [Defendant's] intention was to leave that night when he walked out. If his intentions were to leave and get away from that place, he would not have carried a pool stick with him, when he walked out the door. A man lost his life, and but for [D]efendant's conduct, we wouldn't, we wouldn't be here.

- 19 -

As I said, this matter was captured on video, and [D]efendant could have left, but he chose not to. He chose to go outside with a pool stick and commit this crime. It is unfortunate, it is truly unfortunate that this happened, but nevertheless, it did happen and I believe, and I do hold that incarceration will rationally serve as a deterrent to others that are similarly situated.

The trial court entered its judgment on May 10, 2019. Defendant filed an untimely motion for new trial and motion for judgment of acquittal on July 3, 2019. Following a hearing, the trial court denied the motions in an order dated July 30, 2019. Defendant filed an untimely notice of appeal on August 16, 2019.

## Analysis

*Timeliness*

Initially, we address the State's claim that Defendant's appeal should be dismissed for failure to timely file a motion for new trial, a motion for judgment of acquittal, and a notice of appeal. This court filed an order waiving the untimely notice of appeal on April 9, 2020.

*Aggravated Assault as Lesser-Included Offense of First Degree Murder*

Defendant argues that the trial court erred by charging aggravated assault resulting in death as a lesser-included offense of first degree murder, violating Defendant's constitutionally guaranteed right to notice of the charges against him. The State responds that the trial court properly instructed the jury on aggravated assault resulting in death and that, alternatively, Defendant has not established plain error.

Standard of Review

An untimely-filed motion for new trial is a nullity. *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). A trial court does not have jurisdiction over an untimely motion for new trial, and "an erroneous consideration of ruling on a motion for new trial not timely filed . . . does not validate the motion." *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). "If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." State v.*Bough*, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P 3(e); *Martin*, 940 S.W.2d at 569).

Defendant's failure to raise the issue of a lesser-included offense in a timely motion for new trial waives plenary review of the issue. *Id.*; *see also State v. Michael*

*Dean Hodges*, No. M2014-01544-CCA-R3-CD, 2017 WL 1416862, at *9, n. 1 (Tenn. Crim. App. Apr. 19, 2017) (noting that, while failure to object to a jury instruction for an offense that is not a lesser-included offense does not waive the issue on appeal, a defendant's failure to raise the issue in his motion for new trial does waive plenary review of the issue), *perm. app. denied* (Tenn. Aug. 16, 2017).

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *Hatcher*, 310 S.W.3d at 808. Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007). Defendant cannot show that he did not waive the issue for tactical reasons. Thus, Defendant is not entitled to plain error relief.

## Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his conviction. He argues that Dr. Li's testimony negated causation and thus a required element of the offense. He argues that the testimonies of the paramedics show that the victim was "breathing with a normal heart rate" when first responders arrived and that their improper treatment was the actual cause of the victim's death.

The State responds that Dr. Li's testimony established that, but for the blunt trauma, the victim would not have died. It argues that "criminal defendants must take their victims as they find them." Finally, the State contends that Defendant misconstrues Dr. Li's testimony.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.*

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

A person commits aggravated assault resulting in death who intentionally, knowingly, or recklessly commits an assault, as defined in Tennessee Code Annotated section 39-13-101, and the assault results in the death of another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii); (a)(1)(B)(ii) (2017). A person commits assault under Tennessee Code Annotated section 39-13-101 who "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1) (2017). An intentional or knowing aggravated assault resulting in death is a Class C felony. Tenn. Code Ann. § 39-13-102(e)(1)(A)(iii) (2017). A reckless aggravated assault resulting in death is a Class D felony. Tenn. Code Ann. § 39-13-102(e)(1)(A)(vi) (2017). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2017). A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b) (2017). Defendant was convicted of intentional or knowing aggravated assault resulting in death, under Tennessee Code Annotated section 39-13-102(a)(1)(A)(ii), as a lesser-included offense to first degree premeditated murder.[2]

---

[2] In a footnote, Defendant argues that, because the jury verdict form made no mention of the mens rea of intentional or knowing required for aggravated assault resulting in death, "doubt exists as to whether the jury intended to find [Defendant] guilty of the Class C felony offense that required a showing of intentional or knowing conduct or the Class D felony making it an offense to recklessly assault another resulting in death." However, the jury instructions make clear that aggravated assault resulting in death required a finding of intentional or knowing action. Moreover, the jury verdict forms show a separate offense for "reckless aggravated assault resulting in death," and the jury never reached that verdict.

<u>Intervening Cause</u>

Defendant argues that because the blunt force trauma alone did not cause the victim's death, the State failed to establish an essential element -- that the victim's death was the result of the inflicted bodily injury. However, "[o]ne who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause." *Odeneal v. State*, 157 S.W. 419, 421 (Tenn. 1913). "When the accused inflicts the injury that necessitates the [medical care], he is held to assume the risk attendant on it." *Id.*

In *Letner v. State,* our supreme court discussed the relevance of intervening or superseding acts:

> "Where it appears that the act of the accused was not the proximate cause of the death of the person for whose murder he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a good defense to the charge of homicide."

> [But] . . . "whenever an independent responsible person, disconnected with the defendant, causes some intervening act to be done, the defendant is relieved of responsibility for the consequences thereof, *unless the act of intervention is the natural result of the defendant's act*."

> . . . .

> "The unlawful act or omission need not be the sole cause of death. Thus if defendant's negligence was a cause of the death, it is immaterial that the negligence of the deceased himself or of others also contributed thereto. If an injury caused by defendant contributed to the death, defendant is responsible, although a subsequent mortal wound inflicted independently by another also contributed thereto. Defendant's act or omission need not be the immediate cause of death; he is responsible if the direct cause results naturally from his conduct."

> . . . .

- 23 -

In other words, the defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause when such cause naturally resulted from his wrongful act.

*Letner v. State*, 299 S.W. 1049, 1050-51 (emphasis added) (quoting 13 R. C. L. 750 and 29 C.J. 1078).

Here, while Dr. Li testified that the blunt force trauma to the victim's head would not be sufficient, by itself, to cause death, he also testified that the victim's subsequent agonal breathing, vomiting, aspiration, and cardiac arrest would not have occurred but for the blunt force trauma. The jury was free to accredit Dr. Li's testimony, and this court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659 Moreover, any rational juror could find that the victim's death was a result of the blunt force trauma. Indeed, if any subsequent medical treatment contributed to the victim's death, that treatment "naturally resulted from [Defendant's] wrongful act" of hitting the victim twice with a pool stick, and Defendant "cannot escape the consequences of his wrongful act[.]" *Letner*, 299 S.W. at 1051.

Prior Medical Conditions Contributing to Death

Defendant argues, "Dr. Li's testimony that the blunt trauma was not enough to cause [the victim's] death standing alone negated a finding that the death resulted from the assault in order to establish all of the elements of the offense of aggravated assault resulting in the death of another." The State responds that Defendant must take the victim as he finds him and that the victim's pre-existing conditions do not relieve Defendant of culpability.

"It has long been a stated principle that criminal defendants must take their victims as they find them." *State v. Martavious D. Brooks*, No. M2017-00505-CCA-R3-CD, 2018 WL 3108882, at *13 (Tenn. Crim. App. June 25, 2018) (citing *Odeneal*, 157 S.W. at 421), *perm. app. denied* (Tenn. Oct. 10, 2018). In *State v. Ashton Buford*, the defendant beat the victim who had "[s]arcoidosis; AIDS, not HIV; hypertension; chronic obstructive pulmonary disease; and chronic sinusitis." W2016-01387-CCA-R3-CD, 2018 WL 1182908, at *7 (Tenn. Crim. App. Mar. 7, 2018), *perm. app. denied* (Tenn. July 19, 2018). The victim became unresponsive and eventually died. *Id*. The defendant argued "that the evidence [did] not show that the beating was fatal and that the victim's pre-existing medical conditions caused his death." *Id*. at *24. This court rejected the defendant's argument and noted expert witness testimony that, "while the victim's age and pre-existing conditions exacerbated his injuries, the blunt force trauma was his ultimate cause of death." *Id*.

In the same way, once Dr. Li was apprised of the victim's pre-existing medical conditions, as well as what occurred with the paramedics during transport, he testified that he had not changed his medical opinion that the blunt force trauma was the victim's cause of death. The jury was free to accredit this testimony, and we will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Moreover, Defendant was required to take his victim as he found him. *Odeneal*, 157 S.W. at 421. As in *Ashton Buford*, "[i]n view of the facts, we have no hesitation in concluding that the victim's death was caused by the unlawful acts" of Defendant. 2018 WL 1182908, at *24. Thus, the evidence was sufficient to support Defendant's conviction for aggravated assault resulting in death.

*Length of Sentence*

Defendant argues that the trial court erred in its allocation of weight to be afforded the applied mitigating factors. He asserts that the trial court erroneously found a pool stick to be a "deadly weapon." He contends that the trial court erred in allocating "tremendous weight" to enhancement factor (9) because the "enhancement [is] built into the aggravated assault statute." Finally, Defendant argues that the trial court failed to consider his potential for rehabilitation pursuant to Tennessee Code Annotated section 40-35-103(5) (2019).

The State responds that the trial court properly applied and weighed enhancement and mitigating factors. It argues that Defendant showed no remorse and thus no potential for rehabilitation.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); *Bise*, 380 S.W.3d at 706. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum

length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2019); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

<u>Enhancement Factor (9): Use of a Deadly Weapon</u>

Tennessee Code Annotated section 40-35-114(9) states that a defendant's sentence can be enhanced if "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]" Here, the trial court properly determined that the pool stick used by Defendant was a "deadly weapon" within the meaning of the statute. *See State v. Ronnie Thomas Baker*, No. M2018-02221-CCA-R3-CD, 2019 WL 4899761, at *9 (Tenn. Crim. App. Oct. 4, 2019) (holding that the trial court properly applied the "deadly weapon" enhancement factor to an aggravated assault conviction where "the evidence at trial showed that [the defendant] struck [the victim] on the head with a wooden stick"), *perm. app. denied* (Tenn. Feb. 20, 2020).

Moreover, as charged in the indictment, the use of a deadly weapon is not "built into" the aggravated assault offense as Defendant claims. *See id.*; *see also* Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii) (2017); *State v. Xavier Tyrone Nolan*, No. E2008-02762-CCA-R3-CD, 2009 WL 5083496, at *8 (Tenn. Crim. App. Dec. 28, 2009); *State v. Jeffrey Eugene Wright*, No. M1999-00647-CCA-R3-CD, 2000 WL 264224, at *6 (Tenn. Crim. App. Mar. 10, 2000) (holding that the trial court properly applied enhancement

factor (9) because "the use of a deadly weapon, in this case a brick, is not an element of the offense of aggravated assault resulting in serious bodily injury"). Defendant's aggravated assault conviction as charged in the indictment was predicated upon the death of the victim, not upon his use of a deadly weapon. Thus, the trial court did not abuse its discretion by enhancing his sentence based upon his use of a deadly weapon or in giving that factor tremendous weight.

### Weight of Mitigating Factors

Defendant argues that the trial court erred by failing to give appropriate weight to mitigating factors (2) and (3), that Defendant "acted under strong provocation" and that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense[.]"[3] He argues that the evidence was substantial that Defendant was provoked and threatened. However, as previously noted, "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. The trial court acted within its discretion in applying these mitigating factors with little or no weight.

### Potential for Rehabilitation

Defendant argues that the trial court failed to consider his potential for rehabilitation. "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5) (2019). However, the trial court stated that it considered "the purposes and principles of sentencing" when determining Defendant's sentence length. The trial court is not required to "recite verbatim all the principles of sentencing[,]" and the trial court stated that it considered the purposes and principles of sentencing, the evidence at trial, the presentence report, the nature of the criminal conduct, and evidence of enhancement and mitigating factors. *See e.g., State v. Cleven Johnson*, No. E2012-02303-CCA-R3-CD, 2013 WL 4767187, at *12 (Tenn. Crim. App. Sept. 4, 2013), *perm. app. denied* (Tenn. June 24, 2014). Thus, the trial court did not abuse its discretion.

### *Denial of Alternative Sentencing*

Defendant argues that the trial court erred when it determined aggravated assault resulting in death required a "to-serve" sentence. Defendant argues that the trial court

---

[3] The trial court also applied mitigating factor (10), that Defendant "assisted the authorities in locating or recovering any property or person involved in the crime" but gave the factor no weight. *See* Tenn. Code Ann. § 40-35-113(10) (2019). However, Defendant does not argue the weight assigned to mitigating factor (10).

failed to make specific findings to properly apply the factor of depreciating the seriousness of the offense. He asserts that there was no evidentiary basis for the need for deterrence and that the trial court did not examine the five factors provided by the supreme court in *State v. Hooper*, 29 S.W.3d 1, 10-12 (Tenn. 2000), to properly apply the deterrence factor.

The State concedes, and we agree, that the trial court erroneously held that Defendant was statutorily ineligible for alternative sentencing. However, it argues that the trial court did not abuse its discretion in finding that a sentence of confinement was warranted to avoid depreciating the seriousness of the offense and to deter others similarly situated from committing this type of crime.

In *State v. Caudle*, the supreme court expanded its holding in *Bise* to trial courts' decisions regarding alternative sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Moreover, under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(A) (2019).

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2019). Here, the trial court determined that Defendant was not suitable for probation based on Tennessee Code Annotated section 40-35-103(1)(B) -- finding that confinement was necessary to avoid depreciating the seriousness of the offense and that confinement was particularly suited to provide an effective deterrence to others likely to commit a similar offense.

Deterrence

To deny an alternative sentence based on the effective deterrence prong of Tennessee Code Annotated section 40-35-103(1)(B), "the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated." *Hooper*, 29 S.W.3d at 9. The finding of deterrence cannot be conclusory only; the finding must be supported by proof. *State v. Ashby*, 823 S.W.2d 166, 170 (Tenn. 1991).

Here, there was no proof presented to support the need for deterrence, and there was no proof offered by the State or cited by the trial court to support trial court's conclusion: "There's no doubt in my mind that in this community, there's certainly a need to protect patrons from conduct that was displayed." Accordingly, the trial court erred in applying the effective deterrence prong of Tennessee Code Annotated section 40-35-103(1)(B) to deny an alternative sentence for which Defendant was eligible.

Depreciating the Seriousness of the Offense

Having determined that the trial court erred in applying the effective deterrence principle, "the only remaining reason for denying probation found by the trial court was the seriousness of the offense." *State v. James Demoss*, No. M2019-01583-CCA-R3-CD, 2020 WL 4199987, at *9 (Tenn. Crim. App. July 22, 2020). "When the seriousness of a defendant's crime is the sole reason for ordering incarceration, the circumstances of the particular crime committed by the defendant must be evaluated." *State v. Trent*, 533 S.W.3d 282, 292 (Tenn. 2017). For the trial court to deny probation for this reason, the nature of the aggravated assault resulting in death must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" and "the nature of the offense, as committed, outweighed all other factors . . . which might be favorable to a grant of probation." *State v. Travis*, 622 S.W.2d 529, 534 (Tenn. 1981). In this case, however, the trial court articulated no findings or reasons to support the application of the seriousness of the offense prong of Tennessee Code Annotated section 40-35-103(1)(B) but simply stated, "I absolutely believe that probation in this scenario would unduly depreciate the offense." Accordingly, the trial court erred in applying the seriousness of the offense prong of Tennessee Code Annotated section 40-35-103(1)(B) to deny an alternative sentence for which Defendant was eligible.

*De Novo* Review

The trial court erred in its application of the two principles on which it based its decision to deny an alternative sentence. Because the sentence of incarceration imposed by the trial court does not "reflect a decision based upon the purposes and principles of

- 29 -

sentencing," the abuse of discretion standard with a presumption of reasonableness does not apply on appeal. *Caudle*, 388 S.W.3d at 279.

We determine that the record on appeal is adequate for this court to conduct a *de novo* review to determine whether there is a sufficient basis for denying an alternative sentence. In *State v. Trent*, our supreme court noted:

> The guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion." *State v. [Jeremy Brandon] Scott*, No. M2010-01632-CCA-R3-CD, 2011 WL 5043318, at *11 (Tenn. Crim. App. Oct. 24, 2011) (citing [*State v.*] *Bingham*, 910 S.W.2d [448,] 456 [(Tenn. Crim. App. 1985)]). Those factors include (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value. *See State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

*Trent*, 533 S.W.3d at 291.

As to factor one, amenability to correction, Defendant did not accept responsibility for his actions in his allocution. While he initially claimed that he accepted "full responsibilities," he then proceeded to explain how he was provoked and what he did to diffuse the situation, ignoring that he twice hit a man in the head, causing unconsciousness and ultimately death. "[A] defendant's credibility and willingness to accept responsibility for the offense are circumstances relevant to determining his rehabilitation potential." *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) (citing *State v. Anderson,* 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992)). Thus, we conclude that Defendant's amenability to correction may be poor, weighing against alternative sentencing.

Next, the circumstances of the offense show that Defendant and the victim were in a verbal altercation over a pool game prior to walking outside. It is clear from the video surveillance that the victim and his wife agitated Defendant prior to the assault. Both the victim and Defendant walked outside the bar at the same time, and, once outside, Defendant stood still as the victim approached him carrying a beer bottle. Defendant twice struck the victim with a pool stick, and the victim died en route to the hospital. The record also shows that the victim aspirated his vomit, which may have contributed to his death. Thus, the circumstances of the offense do not weigh in favor or against alternative sentencing.

Next, Defendant has two prior convictions for driving on a suspended license. This minimal record weighs in favor of alternative sentencing. *See State v. James Q. Wilkerson*, No. M2003-01164-CCA-R3-CD, 2004 WL 221312, at *2 (Tenn. Crim. App. Feb. 4, 2004).

The presentence report reflects that Defendant was raised by his grandparents and has several siblings living nearby. He is close to his family, and they have supported him. He has no gang affiliation. He left high school just before graduation so that he could work to support his newborn child. He has since earned certifications in welding, woodworking, auto-mechanics, and has a commercial driver's license. He has a consistent work history, often working multiple jobs at once. Defendant has had a long-term relationship with the mother of his third child, and he cares for his oldest child full-time, sharing custody of his second child with the child's mother. He reported that he tried marijuana one time and that he would occasionally drink socially. His employer testified on his behalf at sentencing, assuring the court that Defendant would be welcomed back at work at the conclusion of his sentence. Based on the foregoing, we conclude that Defendant's social history weighs in favor of alternative sentencing.

Defendant reported no past or present mental health issues and rated his health as "excellent." He has no history of addiction. Accordingly, his mental and physical health also weigh in favor of alternative sentencing. Finally, as previously discussed, the record contains no proof concerning the deterrence value of a sentence of incarceration. Therefore, we conclude that the trial court erred in denying alternative sentencing.

## Conclusion

Upon *de novo* review of the record, we conclude that a sentence of split confinement will both serve the ends of justice and fulfill Defendant's rehabilitative needs. Accordingly, Defendant's sentence is modified to reflect service of one year in confinement, with pretrial jail credit and post-judgment credit for time served, to be followed by four years and six months' supervised probation. In addition, the Department of Correction's recommended three-point plan of supervision, as contained in the presentence report,[4] is to be incorporated as conditions of Defendant's probation. This case is remanded for entry of a judgment consistent with this opinion.

---

ROBERT L. HOLLOWAY, JR., JUDGE

---

[4] The presentence report recommended that Defendant obtain his GED, complete anger management and/or cognitive behavioral therapy, and establish stable housing.